H. V. GWINN, Appellant,

v.

ASSOCIATED EMPLOYERS LLOYDS, Appellee.

No. 15621.

Court of Civil Appeals of Texas.

Fort Worth.

June 3, 1955.

Rehearing Denied July 1, 1955.

G. Gordon Whitman, Fort Worth, for appellant.

Cantey, Hanger, Johnson, Scarborough & Gooch and Emory Cantey, Forth Worth, for appellee.

BOYD, Justice.

On December 1, 1951, appellant H. V. Gwinn, then sixty-seven years of age, sus- tained serious injuries in an industrial ac- cident occurring while he was in the course of his employment as a night watchman for Kimbell Milling Company, a subscriber of appellee Associated Employers Lloyds, un- der the Workmen's Compensation Laws. Vernon's Ann.Civ.St. art. 8306 et seq. Ap- pellant was earning approximately $41.25 per week. Appellee paid appellant $125 compensation at the rate of $25 per week. In March, 1952, the parties signed a pur- ported compromise settlement agreement whereby appellant was to be paid $500 in full settlement of his claim. Appellant ac- cepted the $500, and executed a compro- mise settlement receipt therefor. The set- tlement was approved by the Industrial Ac- cident Board. Appellant filed this suit to set aside the purported settlement. The court granted appellee's motion for sum- mary judgment.

Appellant alleged as alternative grounds for relief (1) that he was induced to sign the purported compromise settlement agree- ment by the fraud and misrepresentation of appellee's claim agent, who led appellant to believe that the $500 appellant was to re- ceive for signing the instrument was for back pay and for time lost from work; (2) that appellant and appellee, when en- tering into the purported agreement, were laboring under a mutual mistake of facts as to the nature, extent, and certainty of appellant's injuries, and of their suscepti- bility of being satisfactorily established, and that actually appellant's injuries were then definite and ascertainable; (3) that appellant was induced to sign the instru- ment by the fraud of appellee and its agent in that appellee had superior knowl- edge of the nature and extent of appellant's injuries, and appellant was ignorant there- of; and (4) that at the time the instru- ment was signed, both appellant and ap- pellee were ignorant as to whether appel- lant's injuries were indefinite, uncertain, and not susceptible of definite ascertain- ment, since at that time neither appellee nor appellant had received a medical report. Appellant insists that there were genuine issues of material fact as to each of these grounds.

There was no affidavit filed in support of appellee's motion for summary judgment; but attached to such motion was appellant's deposition. Appellant filed his response to the motion, and filed affidavits of his attorney and his wife.

Appellant has many points of error, the substance of all of them being that appellee has not shown that there is no genuine issue of material fact in the case.

In his deposition appellant testified: that appellee's claim agent, J. E. Hutchison, came to see appellant in the hospital where appellant was confined on account of his injuries, and told appellant "not to worry, that everything would be all right and anything I needed, he would take care of it;" witness thought something was said about compensation, and witness began receiving compensation checks; about December 12, 1951, the agent came to appellant's home and took from appellant a written statement as to how the accident happened; the agent told appellant that his signing the statement would not be releasing liability; after this second visit, the agent came to appellant's home again and said "they would make some kind of a settlement, compensate me for the loss of time and all, and we agreed on $500.00;" the agent first offered $450, and appellant told him that "that looked mighty small to me for what I went through with and I said it looked to me like I ought to have $500.00 anyhow, and he finally said he would see the company and see what he could do about it;" the $500 "did not compensate for the loss of my time;" witness did not remember that they talked about anything else.

"Q. As best you can recall, tell me how the conversation went about this settlement; about what was said by him and you about this settlement that you finally arrived at $500.00. A. My understanding was, he was paying me $500.00 for my loss of time down there and to help me out. He said, 'To help you out.' I did not figure, I figured I ought to have more than that, but he was very nice in coming out

and offering to help me. I was just down and out.

"Q. What did you tell him when he offered you $450.00? A. I told him I thought I at least ought to have $500.00.

"Q. To settle your claim? A. I did not say to settle the claim. I said to pay me for what I had lost. No, I did not say to settle the claim.

"Q. Was anything said about settling the claim? A. No, not that I know of. I can't remember anything said about settling the claim.

"Q. You knew that the $450.00 or the $500.00, whatever you agreed on, was in settlement of your claim? A. I did not know that cancelled the claim. I thought that was for my loss of wages and stuff. I never, for a minute, thought that was a release and released me from the deal, altogether. If I had, I would not have signed it.

"Q. Do you remember signing an agreement out there? A. Yes, I signed something. I don't know what it was. * * * I supposed it was an acknowledgment of the money he was paying me for loss of time and wages. * * *

"Q. How come you to take the $500.00 if you thought you were entitled to more? A. I thought, as I told you, that I thought it was paying me for, to help me out for my wages I had lost down there.

"Q. Why did you think that? A. I just thought maybe they would because I was pretty badly jammed up.

"Q. Where did you get the idea that the 500 was in payment of your wages? A. That was an idea that went through my head.

"Q. That is just the way you had it figured? A. That is the way I had it figured. * * *

"Q. Was there anything in your conversation with him that gave you this idea about this being compensation for

your wages? A. That was my understanding of it.

"Q. Where did you get that understanding? A. Because I was drawing $41.25 when I got hurt. That was my regular wages. Then it was cut back to $25.00 and I supposed that was making the difference up.

"Q. Did anybody tell you that was what it was for? A. No. He said that he was doing it to help me out, and I supposed it was for the difference or something. I did not know how it figured out. I sure did not figure that was a final settlement of the thing."

Appellant testified that neither he nor his wife read the instrument, but "guessed" that he could have read it; that a man other than Hutchison brought the check to appellant.

Appellant testified that he was still suffering all the time, more or less, from the injuries; and that appellee's physician, Dr. Armstrong, was the only physician who treated him. He further testified that Dr. Armstrong said to him, " 'At your age, you cannot tell what these things will develop into, at your age, what will happen, and further on we cannot tell what that might be later on, but at present you are as good as I can do for you.' "

In the affidavit of appellant's wife it is stated that she was present every time any of the representatives of appellee were at appellant's home, and could testify about all the conversations appellee's agents had with appellant, and that she never heard anybody tell her husband that he was signing a release. Mrs. Gwinn signed the compromise settlement receipt as a witness. In her affidavit she said that she asked the man who brought the paper to their home if it was a release, and was told that it was not.

In the affidavit of appellee's attorney it is said that appellant's deposition was not the entire testimony of appellant in regard to the case, and that other testimony could be offered in support thereof.

It is our opinion that the testimony of appellant shows that there is no issue of fact as to whether appellee's agent was guilty of fraud or misrepresentation in procuring appellee's signature to the purported compromise settlement agreement. We find no evidence of misrepresentation or concealment. There having been no fraudulent conduct to induce appellant's acceptance, cancellation will not be decreed upon proof of the fact that appellant did not understand all the stipulations of the instrument. 7 Tex.Jur., p. 909, sec. 18.

"Generally speaking, cancellation may not be had because of a unilateral mistake, * * *. A mistake which authorizes a decree of cancellation is not disclosed by proof of a mistake by one of the parties as to the contents of the instrument, * * *." 7 Tex.Jur., p. 931, sec. 30.

"To set aside for fraud a compromise settlement approved by the Industrial Accident Board there must be a satisfactory showing of fraud sufficient to justify relief. Mere inadequacy of consideration does not justify the setting aside of the agreement in the absence of duress, fraudulent conduct or overreaching on the part of the insurer * * *. In a suit to set aside a compromise settlement on the ground of fraud, the rules of common law pertaining to suits for recission and cancellation are applicable. Brannon v. Pacific Employers Ins. Co., 148 Tex. 289, 224 S.W. 2d 466; Texas Employers' Ins. Association v. Kennedy, 135 Tex. 486, 143 S.W.2d 583; Traders & General Ins. Co. v. Bailey, 127 Tex. 322, 94 S.W.2d 134. In order for a plaintiff to have a release canceled he must show, among other things, false representations and that they were made by the defendant or his duly authorized agent, and that plaintiff relied upon such representations." Cordova v. Associated Employers Lloyds, Tex.Civ.App., 263 S.W.2d 270, 273.

We are unable to see how the affidavits of appellant's attorney and his wife raise any issue of material fact. In neither is it alleged that evidence of fraud is avail-

able. If appellant's deposition was not his "entire testimony" in regard to the case, it is not said what his additional testimony would be. And it is not claimed that what he testified to in his deposition was not the truth, and the whole truth.

In our view, appellee proved by appellant's deposition that there was no misrepresentation or concealment, and there is no intimation in the record that appellant was mistaken in his testimony. When the facts stand unchallenged, there is no issue to try. Broussard v. Austin Road Co., Tex.Civ.App., 276 S.W.2d 912; Fowler v. Texas Employers' Ins. Ass'n, Tex.Civ. App., 237 S.W.2d 373; Lindsey v. Leavy, 9 Cir., 149 F.2d 899; 3 Moore Federal Practice, pp. 3174, 3175; Note, 29 Texas Law Review, 688.

We have considered all of appellant's points, but think that error is not shown.

The judgment is affirmed.